UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KARIN D.,[1]

                              Plaintiff          DECISION AND ORDER

-vs-
                                                 6:20-CV-1158 CJS

COMMISSIONER OF SOCIAL
SECURITY,
                              Defendant.

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant")

which denied the Title II application of Plaintiff for Social Security Disability Insurance

("SSDI") benefits.  Now before the Court is Plaintiff's motion (ECF No.14) for judgment

on the pleadings and Defendant's cross-motion (ECF No. 15) for the same relief.  For

the reasons discussed below, Plaintiff's application is denied, and Defendant's

application is granted.

## STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step

sequential evaluation process:

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective
immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in
the United States District Court for the Western District of New York, any non-government party will be
identified and referenced solely by first name and last initial."

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.  First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.  The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.  In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).  Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).

The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the

> Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id.*

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.  The Court will refer to the record only as necessary to rule on the alleged errors identified by Plaintiff.

Plaintiff, who completed high school and college, previously worked as a debt collector, retail sales associate and housekeeper.[3]  Between 2011 and 2016, Plaintiff

_____

[3] Tr. 135, 165.

was self-employed cleaning houses and caring for elderly clients.[4]

In the administrative proceedings before the Commissioner, Plaintiff claimed to have become disabled as of November 30, 2016, due to impairments including bipolar disorder, opiate addiction, chronic obstructive pulmonary disease ("COPD"), migraine headaches and gastroesophageal reflux disease ("GERD").[5]   However, Plaintiff, who was previously able to work despite those conditions, told her doctor that she stopped working specifically so that she could enter in-patient rehab for her heroin addiction.[6]

Plaintiff reportedly began experiencing mental health symptoms (depression, anger, anxiety) in high school, and subsequently began using drugs including marijuana, ecstasy, cocaine, LSD, and prescription opiates.[7]   Plaintiff subsequently began buying opiates on the street for approximately six years, after which she had a remission of about six years while she was taking suboxone.[8] However, she relapsed and began injecting cocaine and heroin heavily for approximately two years.[9]   Plaintiff is

---

[4] Tr. 135, 165.

[5] Administrative Transcript ("Tr.") at 134.

[6] On March 28, 2016, during a visit to her primary care physician, Plaintiff stated that she had stopped working at her usual jobs, cleaning homes and caring for an elderly persons, specifically so that she could attend in-patient rehab: "[L]ast worked privately cleaning homes and taking care of elderly – worked up to this past Jan[uary.]  [S]topped working due to planning inpatient rehab but unable to get into rehab and thinks she lost clients[.]  [L]ast worked [at other jobs] 6 years ago – worked in collections and pet store. Tr. 447.  Upon examining Plaintiff the nurse practitioner noted: "[D]iagnosis is unclear but seems like opioid dependency use d/o [(disorder)] and cocaine abuse with mood disorder, dysthymic disorder[.]  . . .  She is not recovery based and presents with emotions of helplessness, hopelessness and abandonment which most likely have presented as obstacles to therapy in the past.  . . .  [I] strongly encourage inpatient rehab as she is unstable from substance abuse and at high risk for overdose or worsening depression." Tr. 448.

[7] Tr. 738.

[8] "Suboxone, a combination medication containing buprenorphine and naloxone, is one of the main medications used to treat opioid addiction." https://www.health.harvard.edu/blog/5-myths-about-using-suboxone-to-treat-opiate-addiction-2018032014496

[9] Tr. 276, 738.

also a long-time one-pack-per-day cigarette smoker, with some periods of abstinence.[10]

In 2016, Plaintiff made attempts to stop using cocaine and heroin, again using suboxone, but had numerous relapses during that year.  The suboxone was prescribed by Plaintiff's treating addiction specialist/internist Mark D. Fisher, M.D. ("Fisher"). Plaintiff's primary care physician was Agnes Quebral, M.D. ("Quebral").   Plaintiff continued to receive treatment from Fisher for her addiction-related conditions up through the date of the administrative hearing in this matter.  Plaintiff also continued to treat with Quebral for medical conditions such as migraine headaches and GERD, which were generally well-controlled with medication.[11]

On February 22, 2016, Fisher noted that Plaintiff had come to him for treatment of opioid dependence, noting, "[she] has been using IV heroin for the past year, sometimes speedballing with cocaine, using up to a bundle per day.  Last use was this morning." Tr. 464.  Fisher further wrote that Plaintiff "had a mental health diagnosis of depression and has received treatment for that.   She currently denies any severe depression or suicide ideation or suicide attempts.  .  .  .   No other mental health diagnoses, never had any inpatient psychiatric hospitalization.   No learning disorder or personality disorders." Tr. 464.

On July 6, 2016, Fisher clarified that he did not think Plaintiff was depressed, but, rather, was hypomanic and possibly bipolar, though a specific diagnosis remained "obscure," except that she had a mood disorder related to her substance abuse:

---

[10] Tr. 447.
[11] *See, e.g.,* Tr. 292, 295, 260, 521, 782, 800.  There is no indication that Plaintiff's COPD caused functional limitations.

> [W]e are questioning the diagnosis of depression and treating her as bipolar 2 with mood stabilizers.  At the present time, formal diagnosis remains obscure other than to say she has a mood disorder associated with her long-standing history of polysubstance abuse and poor coping skills.  As such, it is best characterized as [diagnosis code] F 19.94[, "other psychoactive substance use, unspecified with psychoactive substance-induced mood disorder"].

Tr. 237.  On October 3, 2016, Plaintiff reported that she was abstaining from opioids with the use of suboxone, but felt overwhelmed, worried and unable to think clearly, secondary to worrying about relapsing into drug usage. Tr. 295.  Plaintiff further stated that she felt "tired," "lethargic" and "in a funk." Tr. 295.

On May 22, 2017, Plaintiff told Fisher that she felt depressed and anxious, and that since their last visit she had experienced several panic attacks, usually in the morning. Tr. 260.  Fisher stated, "She is scared about her future." Tr. 260.  Plaintiff further indicated that she was looking for employment and "felt like a loser" for being financially dependent upon her family, to which Fisher reportedly stated that she should "try [a] disability lawyer." Tr. 260.

On July 13, 2017, Plaintiff told Quebral's Nurse Practitioner ("NP") that Lithium prescribed by Fisher was successfully treating her erratic moods and periods of hypomania. Tr. 275.  Plaintiff reported that she still experienced times of depression, particularly during her menstrual period, but that Zyprexa was helping. Tr. 275; *see also*, Tr. 278 ("She is currently feeling depressed but was recently started on Zyprexa about three weeks ago and is beginning to have some improvement in her depression.  She has been feeling more stable in regards to mood lability and has not been having any

manic episodes since starting Lithium.").  Plaintiff also indicated that she felt anxiety about returning to work and wondered if she would be successful in a new job. Tr. 275.

On January 10, 2018, Plaintiff reported feeling apathy, fatigue, disorganization and difficulty paying attention to tasks. Tr. 521 ("[S]he has extreme difficulty organizing her house and feels overwhelmed to the point of crying.").  Plaintiff also stated, though, that Lithium was helping stabilize her mood, and that she was not having angry outbursts or panic attacks. Tr. 521.

On June 25, 2018, Fisher reported that Plaintiff was "doing well on her current medications" and attending Narcotics Anonymous meetings. Tr. 487.  Lithium was preventing manic episodes and panic attacks, and Prozac was improving her depression. Tr. 487.  Plaintiff also reported traveling several hours to her hometown to visit her mother, who was confined to a nursing home. Tr. 487.

On December 19, 2018, Plaintiff told Fisher that she was still bothered by headaches, and knew that the headaches were related to her cigarette smoking. Tr. 804.  Plaintiff indicated that Lithium was controlling her bipolar symptoms, and that she was not having serious depression. Tr. 804.  Plaintiff also reported that Adderall was helping her to focus and "get stuff done." Tr. 804.  Plaintiff gave similar reports of her symptoms on January 7 and 28, 2019, and noted that she was continuing to visit her mother and had also traveled to Florida with her sister. Tr. 796, 800.

On February 11, 2019, Plaintiff told Fisher that she was not having panic attacks, depression, mania or drug cravings, and was able to focus and get things done. Tr. 792.

Fisher opined that Plaintiff's previous attempts at addiction recovery had failed because her "mental health problems [had not been] addressed and [her] substance use [had] worsened." Tr. 792.

On April 10, 2019, Plaintiff told Fisher that she had enjoyed a weekend trip with her daughter "to the NCAA tournament," and that she had also planned a two-week trip to France. Tr. 780.   Plaintiff also indicated that she was "concerned" about a part-time job that she was to begin soon, cleaning houses for three hours at a time. Tr. 780.   In particular, Plaintiff worried whether she would be organized enough to complete her tasks.   However, Fisher assured Plaintiff that she could manage, and recommended "breathing meditation and using mindfulness." Tr. 780.   Plaintiff denied having mania, panic attacks or racing thoughts. Tr. 781.   Fisher reported that Plaintiff had appropriate mood and affect, intact concentration and average intelligence. Tr. 782.   Fisher also discussed Plaintiff's disability claim and "its implications": "Paperwork for her SSI [sic] hearing was prepared and signed this week by her mental health counselor Mike and this provider.   She has an attorney and had her pre-trial meeting on April 3.   Her trial date is set for this year.   We discussed its implications." Tr. 780.

The disability "paperwork" to which Fisher referred was a form "Mental Treating Medical Source Statement" signed by him on April 9, 2019. Tr. 720-724.   Fisher stated that Plaintiff's diagnoses were bipolar disorder and opiate use disorder, and that the medications she took for those conditions, including lithium and suboxone, caused side effects of extreme fatigue and lethargy. Tr. 720.   Fisher asserted that Plaintiff would

need "lifetime med management for bipolar [disorder] [and] suboxone 12+ months, continued individual therapy as needed." Tr. 720.  When asked to list Plaintiff's "signs and symptoms," Fisher reported anhedonia (loss of interest in almost all activities), thoughts of suicide, persistent anxiety, mood disturbance, difficulty thinking or concentrating, seclusiveness, memory impairment and sleep disturbance. Tr. 721.  With regard to work abilities, Fisher stated that Plaintiff had "satisfactory" ability to remember work procedures, understand and remember and carry out simple instructions, make simple work-related decisions, accept instruction and criticism, and be aware of hazards. Tr. 722.  Fisher stated, though, that Plaintiff was "seriously limited" with regard to maintaining attention, sustaining an ordinary routine, getting along with others, responding to changes and dealing with stress. Tr. 722.  Fisher asserted that Plaintiff would be "unable to meet competitive standards" with regard to maintaining regular attendance, working with or near other people, completing a normal workday and workweek without interruptions from psychological symptoms, and performing at a consistent pace. Tr. 722.  Fisher explained the limitations he identified by stating:

> carry out instructions [sic]  – easily forgotten, focus + concentration is limited.  She struggles to set or achieve goals, especially when operating independently, easily overwhelmed with day to day stress.
>
> ***
>
> [She] struggles on a daily basis to interact with others when necessary, struggles in interpersonal + family relationships- has difficulty leaving her home or getting to obligations on time.

Tr. 723, 724.  Fisher opined that Plaintiff's impairments would cause her to miss more than four days or work per month. Tr. 724.  Finally, Fisher asserted that "alcohol and

substance abuse" did not contribute to any of Plaintiff's limitations that he had identified, noting, "currently abstinent from substance use." Tr. 724.

On May 21, 2019, after Plaintiff's claim was denied initially, a hearing was conducted before an ALJ, at which Plaintiff appeared with her attorney. The ALJ took testimony from Plaintiff and a vocational expert ("VE").

On June 17, 2019, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the alleged disability onset date and the date of the decision. Tr. 15-24. The ALJ found that Plaintiff had severe impairments consisting of depression, bipolar disorder and adult attention deficit disorder, as well as non-severe impairments including COPD and migraine headaches. Tr. 17. The ALJ found that Plaintiff has the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations, in pertinent part:

> [S]he can understand, remember, and carry out simple instructions; she can have frequent interaction with supervisors and occasional contact with coworkers and the public; she can make simple work related decisions; she can tolerate few changes in a routine work setting; she will be off task ten percent of the day due to lapses in attention and concentration; and, she will miss work once a month.

Tr. 19. In making this finding, the ALJ found that Dr. Fisher's opinion was persuasive insofar as it indicated she was able to understand, remember and carry out simple instructions, make simple work related decisions, be aware of normal hazards, and interact with others. Tr. 22. However, the ALJ found that Fisher's opinion was not persuasive with regard to Plaintiff's purported inability to concentrate, leave her house,

deal with anxiety and maintain a regular work schedule without excessive absences, since it was inconsistent with Plaintiff's demonstrated activities:

> For example, the opinion that the claimant would miss four or more days of work monthly is excessive based on the medical evidence of record. Although the claimant testified that she has trouble leaving the house due to her anxiety and fear, during the period at issue, the claimant routinely traveled, including trips to visit and care for her mother and visits with her daughter.   Furthermore, the claimant has demonstrated an intact concentration, an appropriate mood, and appropriate behavior, and logical thought process.

Tr. 22.[12]  The ALJ found that with this RFC, Plaintiff was unable to perform any of her past relevant work, but that she could perform other work. Tr. 22-23.  Consequently, the ALJ found that Plaintiff was not disabled.

Plaintiff sought review by the Appeals Council, but it declined to review the ALJ's decision.  Plaintiff then commenced this action.

In this action, Plaintiff contends that the Commissioner's decision denying benefits must be reversed for the following reasons: 1) the ALJ's evaluation of Dr. Fisher's opinion was "the product of a selective reading of the record"; and 2) the ALJ's RFC findings concerning "time off task and absenteeism" are not supported by substantial evidence.

---

[12] *See also*, Tr. 20-21 ("The medical evidence of record does not substantiate the claimant's mental impairments prevent her from being able to perform work with the above environmental and mental limitations. . . .  Despite [her documented] abnormalities, the record demonstrates the claimant's treatment is generally effective. . . .  The claimant has further demonstrated abilities greater than alleged. Most notably, the claimant testified she has trouble leaving the house due to her anxiety and fear. However, during the period at issue, the claimant routinely traveled to visit and help care for her mother who suffered a stroke during the period at issue.  Furthermore, the claimant traveled to an NCAA hockey tournament in Connecticut and reported that she had a good time.  Additionally, the claimant went on trips to Florida after the holidays and had a planned trip to France for two weeks at the end of June 2019.").

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.   In particular, Defendant maintains that the RFC finding is consistent with the record as a whole.   *See, e.g.*, Def. Memo of Law, ECF No. 15-1 at p. 8 ("The ALJ found that the overall record, including generally normal findings on psychiatric examinations, and generally effective treatment consisting of therapy and medications with no hospitalizations, coupled with Plaintiff's own description of her activities, demonstrated a level of functionality consistent with the RFC for simple unskilled work."); *see also, id*. at p. 14 (Providing a detailed review of the record evidence supporting the RFC finding.).

The Court has carefully reviewed and considered the parties' submissions.

DISCUSSION

The ALJ's Alleged Selective Reading of the Record

Plaintiff maintains that the ALJ's evaluation of Fisher's medical source statement was the result of selective reading of the evidence, and that the ALJ gave only "dubious reasons" for finding parts of Fisher's statement unpersuasive.   Indeed, Plaintiff asserts that "[t]he ALJ's findings with respect to Dr. Fisher's opinion directly conflicts with the majority of the record, which clearly outlines, through its entirety, that Plaintiff suffers from certain days where her depression is extremely limiting, but has other days in which she is able to function sufficiently to perform activities of daily living."[13] Plaintiff contends, on that point, that the ALJ improperly failed to "acknowledge"[14] her contention

---

[13] ECF No. 14-1 at p. 18.
[14] ECF No. 14-1 at p. 18.

that she is essentially incapacitated and "almost suicidal" one week per month during her menstrual cycle, which amounts to a selective reading of the evidence.[15] Alternatively, Plaintiff alleges that the ALJ engaged in "cherry picking" of evidence that supported his RFC finding while ignoring contrary evidence. Additionally, Plaintiff states that the ALJ "paid short shrift" to the fact that she was taking "very serious medications," and "failed to evaluate the reality of" her medication management. Plaintiff contends that the ALJ's alleged errors were "decidedly harmful," since Dr. Fisher's report, if accepted in its entirety, establishes that she is disabled.

Of course, an ALJ is not permitted to "cherry pick" evidence that supports his RFC finding. *See, Bohart v. Astrue*, No. 10-CV-6503, 2011 WL 2516413, at *5 (W.D.N.Y. June 23, 2011) ("An ALJ cannot selectively choose the only portions of a medical opinion that support his determination, while ignoring others.") (citations omitted).

> Cherry-picking can be defined as "inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source." *Artinian v. Berryhill*, No. 16-cv-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018). Cherry-picking can "indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Id.* (*quoting Younes v. Colvin*, No. 1:14-cv-170, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015)). But an allegation of cherry-picking is "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of*

---

[15] Plaintiff is mistaken about that, as the ALJ specifically acknowledged that contention multiple times. *See*, Tr. 19 ("She further testified that she experiences one week per month where she is unable to perform basic tasks."); *see also*, id. at 20 ("Additionally, the claimant testified she experiences on 'bad' week per month. She alleged, during this 'bad week,' her depression does not allow her to do anything. She further alleged during this 'bad week' she cannot even perform daily activities or household chores, which causes the chores to 'mount up.'").

*Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014). Indeed, what a claimant may label as cherry-picking can often be described "more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).

*Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *3 (D. Conn. June 21, 2022).

In the instant case, the Court finds that the ALJ did not engage in improper cherry-picking of evidence, and that Plaintiff is really asking the Court to re-weigh evidence, which it may not do.  In that regard, the Court notes that Plaintiff is simply incorrect in asserting that the ALJ failed to acknowledge her contention that she is essentially incapacitated by mental health symptoms one week per month, during her menstrual cycle.  Rather, the ALJ mentioned that assertion multiple times, but ultimately concluded that Plaintiff's claimed level of disability was inconsistent with the evidence as a whole. *See*, Tr. 19 ("She further testified that she experiences one week per month where she is unable to perform basic tasks."); *see also, id*. at 20 ("Additionally, the claimant testified she experiences on 'bad' week per month.  She alleged, during this 'bad week,' her depression does not allow her to do anything.  She further alleged during this 'bad week' she cannot even perform daily activities or household chores, which causes the chores to 'mount up.'").  Nor does the Court agree that the ALJ gave only "dubious" reasons for finding parts of Fisher's opinion unpersuasive.  Rather, the ALJ cited specific, extensive activities of daily living by Plaintiff that he found to be inconsistent with the highly restrictive picture painted by Dr. Fisher's report.  The ALJ's

findings in that regard are supported by substantial evidence, which as noted above is deferential standard.   In sum, the Court finds that Plaintiff's arguments concerning cherry picking and/or selective reading of the record lack merit.

<u>The ALJ's RFC Findings Regarding "Off Task Time" and Absenteeism</u>

Plaintiff next maintains that the ALJ's RFC findings concerning "time off task and absenteeism" are not supported by substantial evidence.   As noted earlier, the ALJ found that Plaintiff would be off task 10% of the time, and would miss one day of work per month, due to her impairments.  Plaintiff contends that the ALJ did not explain those findings.  In particular, Plaintiff alleges that an ALJ's RFC findings must be supported by medical opinion evidence, and that the ALJ did not relate those findings to any particular medical opinion evidence.[16]

However, an ALJ's RFC finding need not correspond to any medical opinion, and need only be supported by substantial evidence. *See, Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022) ("The ALJ is permitted to discount the opinion of a treating physician if it is inconsistent with other substantial evidence. *See Halloran* [*v. Barnhart*], 362 F.3d [28,] 32 [(2d Cir. 2004)].   And the ALJ bears "the final responsibility" for making RFC determinations. 20 C.F.R. § 404.1527(d)(2). It follows from these basic principles that the ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence.").[17]   Consequently, to the

---

[16] *See*, ECF No. 14-1 at p. 20 ("[A]n ALJ's RFC assessment is a medical determination that must be based on probative medical evidence of record[.]").

[17] *See also, Michael R. v. Kijakazi*, No. 20-CV-6807F, 2022 WL 3009531, at *4 (W.D.N.Y. July 29, 2022) ("[A]n ALJ may formulate an RFC absent any medical opinions. *See Monroe v. Comm'r of Soc. Sec.*, 676 Fed.Appx. 5, 8 (2d Cir. 2017) ("Where, [ ] the record contains sufficient evidence from which an ALJ can

extent Plaintiff is contending that each aspect of the RFC finding must be supported by medical evidence generally, or by Fisher's report in particular, she is incorrect.

Plaintiff nevertheless contends that the aforementioned RFC findings are unexplained, and that "remand is warranted where off-task percentages included in the RFC are unsupported."[18] Plaintiff emphasizes that the ALJ's finding, that Plaintiff would be off task only ten percent of the time, is outcome-determinative, since the VE testified that there were no jobs for claimants who would be off task more than ten percent of the time. The VE similarly testified that there would be no jobs for a claimant who would be absent more than one day per month.

Defendant responds that those limitations are supported by substantial evidence and that Plaintiff failed to carry her burden to show that she would be more limited than what the ALJ found. More specifically, Defendant contends that the limitations are supported by "the normal examination findings and Plaintiff's significant activities,"[19] and that the ALJ properly found "Dr. Fisher's opinion, including that Plaintiff would miss four or more days of work monthly, to be unpersuasive as it was unsupported and inconsistent with the record as a whole."[20]

In considering Plaintiff's argument on this point, the Court observes preliminarily that the burden to establish disability is on Plaintiff, and that, as the ALJ found, Dr.

---

assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." (internal citations and quotation omitted)). Nor need the ALJ's conclusion "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 Fed.Appx. 53, 56 (2d Cir. 2013).").
[18] ECF No. 14-1 at p. 21.
[19] ECF No. 15-1 at p. 24.
[20] ECF No. 15-1 at p. 17.

Fisher's opinion concerning Plaintiff's abilities to maintain concentration and attend work consistently is not particularly well-explained or supported in several respects.   For example, Fisher's report states that Plaintiff's ability to "maintain attention for two hour segment[s]" is "seriously limited," adding:

> Concentration [and] memory are deficient, [she] has extreme difficulty maintaining routine appointments, struggles to engage socially, easily distracted often losing ability to maintain linear thoughts/concentration. Unable/not recommended to engage in extended periods of concentration/functioning.

Tr. 722.   However, that assertion is puzzling, considering that when Plaintiff told Fisher that she was nervous about returning to work part time, which was going to involve her cleaning houses by herself for three-hour blocks of time, he assured her that she could handle it:

> She is concerned about upcoming part-time job cleaning a house[, a] three-hour commitment.  [She said:]"I'll have to get everything done within that time and I need to line it up in order to do it in an organized fashion." We practiced breathing meditation and using mindfulness. *I asked her to remember that this was something she could do confidently.*

Tr. 780 (emphasis added).[21]   Fisher also noted during this same visit that Plaintiff had planned a two-week visit to France, and expressed no concern or doubts about her ability to manage international travel. Tr. 780.[22]   Such evidence is hardly consistent with Fisher's report.   Nor does Fisher's report explain why he believed that Plaintiff would

---

[21] Fisher made that notation one day after he completed Plaintiff's functional assessment form. Tr. 724, 780.

[22] Even though Fisher was aware that Plaintiff was leaving for a two-week trip to France, he wrote in his report that she "has difficulty leaving her home." Tr. 724.

miss more than four days of work per month, as opposed to some fewer number of days.  Nevertheless, Plaintiff maintains that Fisher's report is "well supported,"[23] while insisting that the ALJ's RFC finding is not.

The Court, though, finds that Plaintiff has not shown that the ALJ's RFC findings on these points is unsupported by substantial evidence.  That is, the ALJ identified various pieces of evidence, primarily involving Plaintiff's activities of daily living, that are consistent with the RFC finding and inconsistent with the claim that Plaintiff cannot maintain concentration or a regular schedule, and Plaintiff has not shown that a reasonable factfinder would have to conclude that she would be off-task more than ten percent of the time or that she would miss more than one day of work per month. *See, Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) ("Smith had a duty to prove a more restrictive RFC, and failed to do so. 42 U.S.C. § 423(d)(5); *cf. Barry v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015) (summary order) ("A lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits."); *see also, Holly M. v. Comm'r of Soc. Sec.*, No. 20-CV-6863MWP, 2022 WL 2160236, at *7 (W.D.N.Y. June 15, 2022) ("As the Commissioner points out, plaintiff does not cite any evidence in the record that contradicts the ALJ's finding that plaintiff "is allowed off task between [five-to-seven percent] of the work day in addition to regularly scheduled breaks and ... no more than one unscheduled or unanticipated

---

[23] ECF No. 14-1 at p. 16.

absence per month." (Tr. 29). . . . Where plaintiff has cited no record evidence supporting more substantial off-task limitations, I do not find that remand is warranted under these circumstances.") (collecting cases); *Sarah S. v. Comm'r of Soc. Sec.*, No. 20-CV-6458S, 2022 WL 34468, at *5 (W.D.N.Y. Jan. 4, 2022) ("Plaintiff also argues that the ALJ's finding that she would be off-task five percent of the time due to attention and concentration lapses is not supported by substantial evidence, because her attention was more limited than the ALJ found. But it is Plaintiff's burden to show that she would be off-task more than the five percent assessed by the ALJ. . . . [T]his Court finds that the ALJ's five-percent off-task assessment is supported by substantial evidence, given Dr. Lin's assessment that Plaintiff would have mild limitations in maintaining attention and concentration.  And Plaintiff does not point to any evidence that would support a higher off-task assessment.") (citations omitted).

Nor does the Court find, in this case, that the ALJ was required to explain with greater precision how he arrived at the 10% off-task figure or the one-day-per-month absenteeism figure, since in making those findings the ALJ was not stating that Plaintiff would in fact be off-task for precisely 10% of each day or that she would miss precisely one day of work per month, but, rather, was stating that Plaintiff had not demonstrated that she would be off-task or absent more than what would be acceptable to employers.[24]  In that regard, the VE testified that a claimant could not maintain competitive employment if she was off-task more than ten percent of the time, or if she

---

[24] Dr. Fisher did not indicate that Plaintiff would be off-task for any particular percentage of any work day. Rather, he indicated more generally that Plaintiff's ability to maintain attention was seriously limited, which the ALJ did not find to be persuasive in light of the entire record.

missed more than one day of work per month, which is plainly why the ALJ chose those exact figures. Tr. 59-60.  Consequently, in the Court's view it would make no sense to remand this matter to the ALJ for a further explanation of how he arrived at the off-task percentage and number of absences.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No.14) for judgment on the pleadings is denied, and Defendant's cross-motion (ECF No. 15) for the same relief is granted.  The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
　　　August  *II* , 2022

ENTER:

CHARLES J. SIRAGUSA
United States District Judge